J-S39015-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: K.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: T.D., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1974 EDA 2025 |

Appeal from the Order Entered June 25, 2025
In the Court of Common Pleas of Wayne County
Civil Division at No: CP-64-DP-0000004-2024

| | | |
|---|---|---|
| IN THE INTEREST OF: K.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: T.D., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1975 EDA 2025 |

Appeal from the Decree Entered June 25, 2025
In the Court of Common Pleas of Wayne County
Civil Division at No: 2025-00012

BEFORE:  STABILE, J., NICHOLS, J., and SULLIVAN, J.

MEMORANDUM BY STABILE, J.:                    **FILED MARCH 13, 2026**

T.D. (Mother) appeals from the June 25, 2025, decree involuntarily terminating her parental rights to her biological son, K.B., born April 2018 ("Child").  Mother also appeals from the order entered the same day changing K.B.'s permanency goal to adoption.  Upon review, we affirm the termination decree and dismiss Mother's appeal from the goal change order as moot.

We glean the factual and procedural history of the above-captioned matters from the certified record. Wayne County Children and Youth Services ("CYS") has history with this family dating back to 2017. On December 14, 2023, a warrant was executed on R.B. (Father) and Mother's home based on suspected drug trafficking. *See* Petition for Dependency, 3/8/24. Father was arrested. *Id.* Mother admitted to using drugs and tested positive for methamphetamines, fentanyl, and THC. *Id.* An in-home safety plan was established by CYS and removed shortly thereafter because Mother started to cooperate with CYS and had a negative drug screen. *Id.* Father was then released from jail. *Id.*

Approximately one month later, Mother and Father were charged with harboring a fugitive and possession of drug paraphernalia. *Id.* Father was again arrested.[1] *Id.* At that time, a second in-home safety plan was established by CYS. *Id.* On February 21, 2024, CYS determined that the in-home safety plan was no longer feasible as Mother tested positive for methamphetamines and amphetamines. *Id.* As a result, Mother signed a 30-day voluntary placement agreement. *Id.* On March 8, 2024, CYS filed a petition for dependency noting that Father was incarcerated and it was not safe for K.B. to return to Mother's care as CYS had concerns with Mother's lack of cooperation, substance abuse, mental health, parenting skills, and

_____

[1] Father pleaded guilty to harboring a fugitive and possession with intent to deliver and was sentenced on May 9, 2024, to an aggregate 12 to 36 months imprisonment and 18 months concurrent probation. *See* CP-64-CR-33-2024 and CP-64-CR-387-2023.

housing stability. *Id.* On March 12, 2024, CYS was awarded protective custody of K.B., and, at a shelter care hearing, the court determined K.B. should remain in the care and custody of the agency.

K.B. was adjudicated dependent on March 26, 2024, and placed in foster care, where he remained during the pendency of these proceedings. On May 16, 2025, CYS filed a petition to involuntarily terminate Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a) and (b).[2] The court held a termination hearing on June 17, 2025, wherein CYS presented the testimony of CYS caseworker Michael Murolo.

At the conclusion of the hearing, the court took the matter under advisement and ultimately entered a decree involuntarily terminating Mother's parental rights pursuant to 23 Pa.C.S.A. §§ 2511(a)(2), (5), (8), and (b). This timely appeal followed.[3] Mother raises the following issues for our review, renumbered for ease of disposition:

1. Whether the trial court erred as a matter of law in determining that the parental rights of [Mother] was warranted[.]

2. Whether the trial court erred as a matter of law in determining that the termination of parental rights of [Mother] would serve the developmental, physical and emotional needs and welfare of the minor child[.]

_____

[2] John J. Martin, II, Esquire, was appointed as both legal counsel and *guardian ad litem* for K.D. **See** Order, 5/20/25. The trial court determined that there was no conflict between the child's best interests and the child's legal interests. **Id.**

[3] Father also appealed the termination of his parental rights. His appeals are separately pending before this Court.

3. Whether the trial court erred as a matter of law in changing [the] placement goal for the subject minor child[.]

Mother's Brief, at 11.

Our standard of review in this context is well-settled:

In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. When applying this standard, the appellate court must accept the trial court's findings of fact and credibility determinations if they are supported by the record. Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion.

An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion or the facts could support an opposite result. Instead, an appellate court may reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings.

In considering a petition to terminate parental rights, a trial court must balance the parent's fundamental right to make decisions concerning the care, custody, and control of his or her child with the child's essential needs for a parent's care, protection, and support. Termination of parental rights has significant and permanent consequences for both the parent and child. As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

*Interest of M.E.*, 283 A.3d 820, 829-30 (Pa. Super. 2022) (internal citations and quotations omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, which requires a bifurcated analysis:

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interest of the child.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (internal citations omitted). "We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence." *In re B.L.W.*, 843 A.2d 380, 383 (Pa. Super. 2004) (*en banc*), *appeal denied*, 863 A.2d 1141 (Pa. 2004) (citing *In re C.S.*, 761 A.2d 1197, 1199 (Pa. Super. 2000)).

Here, the trial court terminated Mother's parental rights pursuant to Section 2511(a)(1), (2), (5), (8), and (b). We need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b), to affirm. *Id.* at 384. We begin our analysis with Section 2511(a)(2), which states:

> The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control, or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S.A. § 2511(a)(2). "The grounds for termination are not limited to affirmative misconduct, but concern parental incapacity that cannot be remedied." *In re Adoption of A.H.*, 247 A.3d 439, 443 (Pa. Super. 2021), *appeal denied*, 258 A.3d 1144 (Pa. 2021). We emphasize that "[p]arents are required to make diligent efforts toward the reasonably prompt assumption of full parental duties." *Id.* "A parent who is incapable of performing parental duties is just as parentally unfit as one who refuses to perform the duties." *B.L.W.*, 843 A.2d at 387-88.

> The trial court found that since K.B.'s placement:

> Mother has demonstrated little progress toward alleviating the circumstances necessitating the original placement, and what little progress she had made has stagnated. Mr. Murolo testified to Mother's difficulties in maintaining her sobriety and her refusal to take responsibility for her substance abuse problems. Mother stopped complying with drug screens after March 20, 2025, and only became consistent again once she had been made aware of [CYS's] petition to terminate her parental rights. Mother has struggled to maintain employment, has struggled to find housing that will provide a safe environment for K.J.B., and continues to stay in a residence where drug-use is suspected despite Mother's own problems maintaining her sobriety.

Trial Court Opinion, 6/25/25, at 14.

In her brief, Mother inaccurately stated that CYS sought to terminate her parental rights pursuant to subsections 2511(a)(5) and (8); therefore, her brief is limited to those two subsections. A review of the petition to involuntarily terminate parental rights shows that CYS sought termination pursuant to subsections 2511(a)(2), (5), and (8). This, however, does not hinder our analysis.

Mother's permanency objectives essentially remained the same throughout the life of the case. Initially, Mother's objectives were to: (1) achieve and maintain sobriety; (2) maintain her mental health; (3) obtain employment; and (4) maintain a safe and stable living environment for K.B. N.T., 6/17/25, at 15.

Mother's substance abuse was an ongoing concern to CYS. *Id.* To support Mother in her objective to achieve and maintain sobriety, Mother was ordered to complete a drug and alcohol evaluation and follow all recommendations, and to comply with all drug screens. In June of 2024, Mother completed a drug and alcohol evaluation which recommended an outpatient rehabilitation program. *Id.* at 17. She worked with Pennsylvania Treatment and Healing (PATH) in Honesdale for a few weeks and attended some meetings. *Id.* However, she was ultimately discharged due to multiple failed drug screens. *Id.* Mother also attempted to attend Gaudenzia Fountain Springs on August 1, 2024, but left within hours of being there because she said it felt like a prison. *Id.* at 18.

Regarding drug screens, Mother was scheduled to complete both random and scheduled tests due to her continued denial of a substance abuse problem. *Id.* at 17. Over the course of 15 months, Mother missed most of the drug screens that were requested by CYS, and of the screens that she completed, several were positive. *Id.* at 16-17. Mother tested positive for amphetamines, methamphetamines, cocaine, and marijuana on various

dates. *Id.* She denied having a substance use disorder and claimed that her prescription medications caused false positives. *Id.* Specifically, she claimed that her Wellbutrin prescription could create a false positive for methamphetamines. *Id.* at 18. CYS consulted with Premier Biotech Labs, who stated that it was not possible. *Id.* Mother also claimed that her Vyvanse prescription could create a false positive for amphetamines. *Id.* Premier Biotech Labs did confirm that was possible. *Id.* However, Mother did not consistently test positive for amphetamines as would be expected if the medication was causing the positive test result. *Id.* Mother's last drug screen prior to the termination hearing occurred on June 5, 2025. She was positive for amphetamines, methamphetamines, as well as her Wellbutrin prescription (buprenorphine and norbuprenorphine). *Id.* at 18-19.

We note that it appears that toward the end of the dependency proceedings, Mother was being drug tested by multiple agencies – CYS, Aver Health, Ophelia Medical Group, and Wayne County Adult Probation Department. *Id.* at 36-37. Mother expressed concern with the number of tests she had to take as it impacted on her employment opportunities. *Id.* We also note that Mother's compliance with drug testing significantly increased after CYS filed its petition to involuntary terminate her parental rights. *Id.* at 17.

Regarding Mother's mental health objective, she was ordered to complete a mental health evaluation and follow all recommendations.

Initially, Mother refused to use an agency provider to obtain a mental health evaluation. *Id.* at 21. On October 8, 2024, she completed an evaluation at Robinson Counseling. *Id.* CYS obtained the evaluation on February 21, 2025, and immediately had concerns because it appeared to be very basic and lacked any substance. *Id.* There were no potential diagnosis or recommendations, and the substance abuse section was blank. *Id.* Thus, CYS believed that Mother was not truthful with the information she provided to Robinson Counseling and requested that she get an updated or supplemental. *Id.*

On May 23, 2025, Mother informed CYS that there was a six to eight week wait for another evaluation through Robinson Counseling and requested to use an agency provider. *Id.* CYS told Mother they would not fund an evaluation because she denied the resource for over a year and waited until after the termination petition was filed to try and complete it. *Id.* Additionally, CYS believed that allowing Mother to obtain a last-minute evaluation would only delay permanency. *Id.*

Mother struggled to obtain and maintain employment throughout the dependency proceedings. *Id.* at 19. The caseworker explained:

> On September 19[, 2024], [Mother] claimed she was going to start working at Dave's Super Duper and by the next hearing on [December 17th], she was no longer working for the supermarket saying they didn't offer enough hours. It was never confirmed by [CYS] if [Mother] worked there.
>
> [Mother] started working for Samario's Pizza in Honesdale on March 8[, 2025]. [Mother] had sent the agency paystubs to confirm she was working there. On May 22[, 2025] [Mother] texted her caseworker that she was fired from Samario's due to

> being drug tested too often through Aver Health. [Mother's] caseworker did ask [Mother] to sign a release to confirm with Samario's this was the reason [Mother] was no longer employed, and [Mother] did not – ignored that request.

*Id.* As of the termination hearing, Mother was unemployed.

Likewise, Mother struggled to obtain stable housing and at the time of the termination hearing, was living in a friend's trailer with Father. *Id.* at 20-21, 25. Mother was evicted from her home on March 22, 2024, and "bounced around" staying with friends, some of whom where known drug users, until early 2025 when she began living in the trailer. *Id.* at 19-20. CYS provided Mother with resources to obtain housing. *Id.* at 20. Unfortunately, none of those resources were able to assist.[4] *Id.*

CYS informed Mother that for her current residence to be considered as a home for K.B., the friend with whom she resided would have to be present for home visits, undergo a background check, complete drug screens, and there would have to be a bed for K.B. *Id.* Mother did not believe those requests were possible. *Id.* Additionally, there were structural concerns with the home, and CYS was aware of drug use within the home. *Id.* Candidly, Mother told CYS that she did not believe her current residence was a safe and stable environment for K.B. to live in. *Id.* at 52.

_____

[4] Due to a prior eviction, Mother does not qualify to housing. N.T., 6/17/25, at 53. She was also not eligible for a housing voucher because she lacked stable employment to show that she had income to afford a place on her own. *Id.*

- 10 -

Accordingly, the record demonstrates that Mother's repeated and continued incapacity to comply with her permanency objectives due to her refusal to admit that she has issues with substance abuse and her inability to obtain a mental health evaluation, stable employment and appropriate housing has caused K.B. to be without essential parental care, control or subsistence necessary for his physical and mental well-being. Mother's ability to comply with her objectives coincided with her cooperation with CYS and acknowledgment that she has substance abuse and mental health issues, and her refusal to do so impedes her ability to provide appropriate parental care. Thus, the conditions and cause of Mother's incapacity cannot or will not be remedied. Therefore, the trial court did not abuse its discretion in terminating Mother's parental rights pursuant to Section 2511(a)(2).

We next consider whether the record supports the court's conclusion that there was clear and convincing evidence to terminate Mother's parental rights pursuant to subsection 2511(b). Mother argues that the court abused its discretion by determining that termination of her rights would best serve the developmental, physical, and emotional needs and welfare of K.B. **See** Mother's Brief, at 24. She contends that CYS "conceded that there is a bond between [Mother and K.B.]" and "did not testify or present any evidence whatsoever as to how the termination of parental rights would serve the emotional needs and welfare of the child." **Id.** at 25. Section 2511(b) provides:

> The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.

23 Pa.C.S.A. § 2511(b). "[T]he determination of the child's 'needs and welfare' requires consideration of the emotional bonds between the parent and child. The 'utmost attention' should be paid to discerning the effect on the child of permanently severing the parental bond." *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013).

Our Supreme Court has explained, however, that "the parental bond is but one part of the overall subsection (b) analysis, which includes a determination of whether the bond is necessary and beneficial to the child, *i.e.*, whether maintaining the bond serves the child's developmental, physical and emotional needs and welfare." *Interest of K.T.*, 296 A.3d 1085, 1113 (Pa. 2023). The needs and welfare analysis must also include the consideration of factors such as: "the child's need for permanency and length of time in foster care . . .; whether the child is in a preadoptive home and bonded with foster parents; and whether the foster home meets the child's developmental, physical, and emotional needs, including intangible needs of love, comfort, security, safety, and stability." *Id.* (citations omitted). Importantly, "courts have the discretion to place appropriate weight on each factor present in the record before making a decision regarding termination that best serves the child's specific needs." *Id.*

With respect to its needs and welfare analysis in the instant case, the court explained:

Mother has been unable to maintain her sobriety and tested positive for methamphetamine usage as recent as her June 4, 2025, drug test. Mother failed to obtain a proper mental health evaluation, struggled to obtain and maintain employment, and, as of the termination hearing, was living in a residence where there is suspected drug use. Overall, the court finds that Mother has demonstrated a refusal to take responsibility for her sobriety. . . . There are past domestic violence allegations between Father and Mother. The minor child even ordered Father not to hit Mother during a Zoom visit. Such instability can only negatively impact the minor child's developmental needs, which are currently being met by the minor child's permanency resource, [W.J.] Additionally, Mother and Father have demonstrated an inability to meet the child's physical needs, as they continue to live in a residence which is unsafe for the minor and poses a threat to their own sobriety. The minor child's physical needs are met by residing with his placement resource.

Termination of parental rights best serves the minor child's emotional needs and welfare. The minor child is cared for, loved, and supported by [W.J.], who also promises the minor child continued safety and security. The minor child and [W.J.] are bonded. The minor child is the only child in [W.J.]'s home. The minor child calls [W.J.] "Grandma." [W.J.] has expressed that, out of all the children she has cared for, [K.B.] is her favorite, and even her family loves [him]. [W.J.] has expressed a desire to serve as a permanent resource for the minor child.

Mother and Father cannot offer the minor child this same degree of love, support, security, and safety. This is illustrated by the minor child's needs to express concerns that Father would potentially assault Mother. Mother's lack of concern in and responsibility toward becoming sober, and Father's lack of concern in defending his sobriety against potential triggers also bode ill in their capacity for providing the minor child with emotional care and support the minor child needs.

While the court finds that there is a bond between [K.B.] and Mother and Father, the court finds that these bonds are not beneficial to the minor child. The bond between the minor child

and [W.J.] is suited to meet the minor child's developmental, physical and emotional needs. Ultimately, the potential trauma caused by breaking these bonds is outweighed by the benefit of moving the minor child toward a permanent home.

Supplemental Trial Court Opinion, 1/21/26 at 2-3.

The record supports the court's determination. Mother attended 40 of 65 visits offered. N.T. Hearing, 6/17/25, at 8. The reason for the missed visits varied – Mother confirmed a visit, but cancelled day of; transportation issues; illness; doctor's appointment; four visits were never confirmed; and one visit Mother said she was running late and never showed up. *See* N.T. Permanency Review Hearings, 6/11/24, 9/24/24, 12/17/24, 2/25/25, Exhibit 1. Mother was always attentive during the visits and communicated with K.B. about age-appropriate topics. *See id.*

Although Mother and K.B. have a bond, Mother cannot provide K.B. with the safety and security that he deserves. Mother refused to put Child's needs ahead of her own needs. She has failed to acknowledge that she abuses substances and refuses to take responsibility and become sober for K.B.'s sake. Mother also conceded that the home she currently resides in is not safe for K.B. and she has not taken any steps to obtain her own housing. She also refused to obtain a mental health evaluation that met CYS's requirements. At the time of the termination hearing, Mother was not independent enough to care for Child and reunification was not imminent. The court was unable to return Child to Mother after terminating Father's parental rights because they resided together in a home that has never been assessed by CYS.

Prior to K.B.'s placement, he had not yet attended school despite being old enough to do so. After K.B. was placed in foster care, he attended kindergarten for a few months; therefore, it was recommended that he attend a full year of kindergarten to build a strong foundation with letters, sounds, numbers, etc. N.T. Permanency Review Hearing, 6/11/24, at 9. It was further recommended that K.B. be evaluated to see if he was eligible for an individualized education program (IEP). *Id.* There were also incidents where K.B. was physically aggressive toward other students and misbehaved on the school bus. N.T. Permanency Review Hearing, 12/17/24, at 8. Those behaviors subsided over time while K.B. was in placement. *Id.*

At the termination hearing, K.B.'s grades improved significantly and there were no longer any disciplinary concerns. N.T. Hearing, 6/17/25, at 12. His vocabulary grew exponentially, he can hold full conversations, and he verbalizes his feelings and needs. *Id.* at 7. K.B. was diagnosed with an intellectual disability. *Id.* at 12. Overall, K.B. is healthy and was prescribed Ensure to help him gain weight. *Id.* W.J. reported that K.B. eats and sleeps well and expanded his palette by trying different foods. *Id.* at 7.

Based on the record before us and the standard of review we must employ, we discern no abuse of discretion in the court's conclusion that K.B. is bonded with his foster parent, his foster parent meets his needs and welfare, and that K.B. will not be irreparably harmed by terminating Mother's parental rights. Accordingly, we conclude that the court did not err in determining

K.B.'s developmental, emotional and physical needs and welfare are best met by terminating Mother's parental rights under subsection 2511(b).

As the court's determination pursuant to subsections 2511(a)(2) and 2511(b) is supported by the record, we must affirm the decree terminating Mother's parental rights. *See M.E.*, *supra.*

We now turn to Mother's separate challenge of the court's order changing K.B.'s permanency goal from reunification to adoption. Under Pennsylvania law, our decision above affirming the court's termination decree renders any challenge to the goal change order moot. *See In re Adoption of A.H.*, 247 A.3d 439, 446 (Pa. Super. 2021); *see also In re D.A.*, 801 A.2d 614, 616 (Pa. Super. 2002) ("An issue before a court is moot if in ruling upon the issue the court cannot enter an order that has any legal force or effect."). Accordingly, we dismiss Mother's goal change appeal as moot.

Decree affirmed. Appeal from goal change order dismissed as moot.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 3/13/2026